ALAN C. CHEN, (SBN 224420)
   acchen@zuberlaw.com
MEREDITH A. SMITH, (SBN 281120)
   msmith@zuberlaw.com
HEMING XU (SBN 302461)
   hxu@zuberlaw.com
ZUBER LAWLER & DEL DUCA LLP
777 S. Figueroa Street, 37th Floor
Los Angeles, California 90017   USA
Telephone: +1 (213) 596-5620
Facsimile: +1 (213) 596-5621

Attorneys for Plaintiffs SOS Co., Inc. and
Dogtra Co., Ltd.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOS CO., INC. dba DOGTRA, a California corporation, DOGTRA CO., LTD., a Republic of Korea corporation,, | Case No.: 2:16-cv-9667 |
| Plaintiffs, | **COMPLAINT FOR:** |
| v. | **(1) MISAPPROPRIATION OF TRADE SECRET;** |
| E-COLLAR TECHNOLOGIES, INC., an Indiana corporation; C&D MICRO CO., LTD., a Republic of Korea corporation; HOSUNG SO, aka Ho-Sung So and Mark So, an individual; GREG VAN CUREN, an individual; and DOES 1-10, inclusive, | **(2) BREACH OF FIDUCIARY DUTY;** |
| | **(3) DEFAMATION;** |
| | **(4) TRADE LIBEL;** |
| | **(5) INTENTIONAL INDUCEMENT TO BREACH A CONTRACT;** |
| | **(6) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;** |
| Defendants. | **(7) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** |
| | **(8) INFRINGEMENT OF THE '908 PATENT** |
| | **(9) CONSPIRACY; AND** |
| | **(10) UNFAIR COMPETITION** |
| | **[DEMAND FOR JURY TRIAL]** |

Plaintiffs SOS Co., Inc. and Dogtra, Co., Ltd., for their Complaint herein for misappropriation of trade secrets, breach of fiduciary duty, tortious interference with contractual relationships, trade libel, patent infringement, and unfair competition against defendants E-Collar Technologies, Inc., C&D Micro Co., Ltd., Mr. Hosung So, and Mr. Greg Van Curen, allege as follows:

## THE PARTIES

1.      Plaintiff Dogtra Co., Ltd. ("Dogtra Korea") is a corporation organized and existing under the laws of the Republic of Korea ("South Korea"), with its principal place of business at 145-3, 715-2 Gojan-Dong, Namdong-Gu, Incheon, South Korea.

2.      Plaintiff SOS Co., Inc., dba Dogtra ("Dogtra USA"), is a corporation organized and existing under the laws of the state of California, United States, with its principal place of business at 22912 Lockness Avenue, Torrance, California 90501. Dogtra USA is a wholly owned subsidiary of Dogtra Korea. (Dogtra USA and Dogtra Korea shall be referred to collectively as "Dogtra".)

3.      Defendant E-Collar Technologies, Inc. ("ECT") is a corporation organized and existing under the laws of the state of Indiana, United States.  On information and belief, ECT's principal place of business is currently located at 2120 Forrest Park Drive, Garrett, Indiana 46738.

4.      Defendant C&D Micro Co., Ltd. ("C&D Micro") is a corporation organized and existing under the laws of South Korea.  On information and belief, C&D Micro's principal place of business is 177, Cheongcheon-dong, Bupyeong-gu, Incheon, South Korea.

5.      On information and belief, Defendant Hosung So, also known as "Ho-Sung So" and "Mark So,"  is a citizen of the United States and resides in or near Torrance, California.

6.      On information and belief, Defendant Greg Van Curen is a citizen of the United States residing in or near Fremont, Indiana.

2131-1002 / 543270.1

7.    Dogtra is ignorant of the true names or capacities of the defendants sued herein under the fictitious names Does 1 through 10, inclusive.  Defendants ECT, C&D Micro, Mark So, Greg Van Curen, and Does 1 through 10 are collectively referred to as  "Defendants" in this action.

## JURISDICTION AND VENUE

8.    This action arises under the patent laws of the United States, 35 U.S.C. §§ 271, 281, and 283–285.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.    Defendants, either individually or collectively, offer for sale, market, advertise, sell, use, and/or make the infringing products in this judicial district. The acts and transactions complained of herein were conceived, carried out, made effective, and had effect within the state of California and within this judicial district, among other places.

10.    Venue is proper in this district under 28 U.S.C. §§ 1391(b)–(d) and 1400(b).  Defendants have committed unlawful acts in this judicial district. Defendants either reside or have done business in this venue.

## FACTS COMMON TO ALL CLAIMS

11.    Dogtra Korea develops, manufactures, and distributes high quality electronic training collars for dogs.

12.    Dogtra Korea was founded as a family business by Mr. Ho Yun So, in Seoul, South Korea in 1984. As the family's patriarch, Mr. So relied heavily on family members to fulfill various management and mission-critical work for the company.

13.    In 1995, following a decade of hard work and success, Dogtra Korea expanded its operations by forming Dogtra USA in Fountain Valley, California. Dogtra USA is a subsidiary of Dogtra Korea (collectively, "Dogtra").

14.    In 1999, Mr. So hired his brother, Mark So, to work at Dogtra Korea as its corporate vice president.  In that capacity, Mark So was responsible for assisting

with the development and marketing of products intended for distribution in the United States. The distribution network included nationwide retailers and a large number of small businesses throughout the United States that sold outdoor, hunting, and pet products.

15.     Mark So was privy to—and often in charge of—Dogtra's confidential and proprietary information, including all aspects of product development, manufacturing, export, import, marketing, and customer service, involving a wide range of technologies used in Dogtra Korea's products.

16.     In 2003, Mark So joined Dogtra USA as vice president of sales and marketing without formally relinquishing his position and influence at Dogtra Korea. With the combined work experience as a high-level officer at both Dogtra Korea and Dogtra USA, Mark So acquired knowledge of the most confidential and trade-sensitive details of Dogtra's research and development, product and marketing plans, sales operations, management structure, risk management policies, intellectual property maintenance, development and enforcement issues, and integration of the intellectual property in Dogtra's product lines, supply chain, and distribution network.

17.     Mark So's management role at Dogtra provided him with a platform for receiving direct feedback from retailers and end users to guide the company's research and development of new products. In addition, Mark So's familiarity with the supply chain, including vendors for product manuals, packaging, components, and factories for physical manufacture of Dogtra's prototypes and final products, allowed Mark So to shortcut the development and production process for new products.

18.     Mark So's powerful position within Dogtra also placed him in the unique position of being able to explore and exploit new business opportunities that come across Dogtra's path. Such business opportunities included, without limitation, advancement of prospective business partners or collaborators for developing and

marketing new products, expansion of the network of customers within Dogtra's existing distribution channels, recruitment of talents and affiliates outside of Dogtra, and creation of new inventions for products in the pet collar industry.

19. In addition, and as a direct result of Mark So's management experience at Dogtra, he has an intimate knowledge and understanding of Dogtra's intellectual property portfolio, including the patent-in-suit. As discussed further hereinafter, Mark So was able to utilize that understanding to fine tune and develop other patents for the dog collar industry during and immediately following his employment at Dogtra. These were new opportunities that should have been developed or accrued to the benefit Dogtra. However, Mark So usurped all those opportunities for himself in breach of his fiduciary obligations to Dogtra.

20. It was Mark So's customary practice to maintain a complete set of catalogs, marketing materials, product samples, and customer profiles and contact information in his private office at his residence in the United States. In addition, Mark So used company-issued telephones, facsimiles, and other electronic devices for communication with customers, suppliers and co-workers.

21. Over time and without knowledge of the company's founder, Mark So became so influential within the company that he began to abuse his authority by blurring the line between personal and professional affairs. In both the United States and South Korea, Mark So frequently used employees to help run personal errands unrelated to work. The errands included—by way of example only—demeaning work such as organizing and cleaning Mark So's personal residence, recording Korean television shows and mailing them to the United States for Mark So's personal viewing pleasure, and assembling stereo equipment and furniture for Mark's house. In addition, Mark So used corporate funds to pay for personal entertainment, meals, and excesses such as cigarettes and alcohol.

22. On information and belief, Mark So also frequently took advantage of his position by selling products and samples off the books while pocketing the

2131-1002 / 543270.1

money without reimbursing Dogtra.

23.    On information and belief, Mark So eventually began representing himself as president of Dogtra USA to people outside of the company. Within the company, Mark So further abused his position by frequently using offensive and demeaning language and yelling at Dogtra's employees.

24.    In or about early 2009, after Dogtra's founder became terminally ill, he mandated that Mark So facilitate transfer of management responsibilities from the older generation within the family to the younger generation, many of whom have been working within the company.  In accordance with the patriarch's wish, in or about April 2009, Mark So's position was changed from Dogtra USA's vice-president to "advisor" to make way for the transition.  Mark So's main responsibility in this consulting capacity was to advise and assist the next generation of officers to learn and take over management of Dogtra and to ensure a smooth transition so that the company would be on sound footing after the older generation moves on.

25.    Mark So's employment with Dogtra formally ended on or about December 31, 2010. During those 20 months, Dogtra continued to compensate Mark So for his role as an advisor even though Mark So traveled frequently between South Korea and the United States and only showed up occasionally in either office.

26.    Dogtra entrusted Mark So with all of the company's confidential trade secrets because of the innate trust between the family members. However, Mark So betrayed the company and the family, using for his own benefit Dogtra's confidential and proprietary information when the family needed him the most during the transition.

27.    On information and belief, Mark So was upset that he was not chosen by Dogtra's founder to assume control of Dogtra, and that he was instructed instead with helping a younger generation assume managerial responsibilities.  Mark So used the transition period to plot the creation of multiple new companies in the United States and in South Korea to compete against Dogtra. As discussed further

hereinafter, those new companies overlapped with Dogtra's supply chain and distribution channel, and competed directly against Dogtra from the very first day the new companies' products hit the market. With assistance from his new business partners, *Mark So conspired to create electronic dog collars that would compete with Dogtra's products while still an officer and an employee at Dogtra,* using technology, inventions, and marketing and sales channels, with which he was intimately familiar.

28. As a part of Defendants' scheme to take advantage of and compete against Dogtra, Mark So orchestrated the development of a prototype electronic training collar for Defendants. On information and belief, while still employed at Dogtra, Mark So worked with two ex-Dogtra engineers, lured at least one or more engineers away from Dogtra, used the resources of a separate company Daehan Jeonja ("Daehan"), and developed a prototype electronic collar by Summer of 2010. Mark So specifically assisted and advised on the technical features, production process, and field testing of the prototype collar that was designed specifically for the U.S. market.

29. On information and belief, while still employed at Dogtra, Mark So and Greg Van Curen discussed plans to form a competing venture against Dogtra. On information and belief, Greg Van Curen had the connections to assist with Mark So's plans to import, market, and sell Mark So's new products in the United States.

30. In Spring 2011, Mark So and Greg Van Curen formed two new companies to further carryout their scheme against Dogtra and to maintain the fiction of separation between all Defendants. In South Korea, they formed C&D Micro and, in the United States, they formed ECT. On information and belief, C&D Micro develops, manufactures, and supplies electronic dog training collars to ECT, while ECT serves as the new products' marketing, sales, and customer service arm in the United States. ECT does business, among other methods, through its current website (www.ecollar.com).

2131-1002 / 543270.1

31.    On information and belief, by Fall 2011, Defendants developed and manufactured a new line of electronic dog training collars which directly competed with the products of Dogtra.  Defendants began to market and sell the competing products on or about September 2011.  The products were made available for sale through ECT's website and through its distribution channels in the United States, which consisted of retail stores specializing in outdoor, hunting, pet, and related stores.

32.    On information and belief, Defendants utilized Dogtra's confidential trade secrets to develop a functioning prototype through Daehan, obtain component suppliers, commence the production process, secure distribution channels across the Pacific Ocean, and ultimately brought competing products to market in the United States, *all within nine short months after Mark So left Dogtra. The short ramp-up period to bring the competing products to market would not have been possible without the competitive advantages or trade secrets that Mark So misappropriated from Dogtra and shared with his group of co-conspirators.*

33.    On information and belief, after Defendants developed and manufactured its first generation of products, they terminated the ex-Dogtra engineers at different times over the following years.

34.    Dogtra learned and confirmed Daehan and the former engineers' roles in Defendants' scheme in or about 2016, when Dogtra met and discussed the matter with representatives of Daehan and the former employees.

35.    Collectively, Defendants conspired to manufacture, import, and sell electronic dog training collars that infringe Dogtra's patents, including, without limitation, the '908 patent.  Defendants have shown no remorse for their theft and continued misuse of Dogtra's property.  Defendants conspire to injure Dogtra's business out of malice.

36.    On information and belief, Mark So and Greg Van Curen jointly own and operate C&D Micro and ECT, or serve as directors and/or officers for both

1   corporations. In so doing, the individual defendants operate their businesses by
2   sharing recourses, including business locations and employees, such as the former
3   engineers of Dogtra that Defendants hired and moved from Daehan to C&D.

4   37.   On further information and belief, the individual defendants have
5   comingled the corporate defendants' funds with their own personal funds and/or
6   funds of other businesses.

7   38.   Dogtra is informed and believes, and upon such information and belief,
8   alleges that each of individual defendants named herein were at all times mentioned
9   herein an owner, co-owner, agent, representative, partner, and/or alter ego of their
10  co-Defendants, or otherwise acting on behalf of each and every remaining
11  Defendant, and in doing the things hereinafter alleged, were acting within the course
12  and scope of their authorities as an owner, co-owner, agent, representative, partner,
13  and/or alter ego of their co-Defendants, with the full knowledge, permission, and
14  consent of each and every remaining Defendant, each co-Defendant having ratified
15  the acts of the other Defendants.

16  39.   On information and belief, the individual defendants are, and at all
17  times mentioned herein were, controlled, dominated, and operated by Mark So and
18  Greg Van Curen as their individual business and alter ego, such there is a unity of
19  interest and ownership between C&D Micro and ECT, on the one hand, and each of
20  Mark So and Greg Van Curen, on the other hand, and the individuality and
21  separateness of corporate defendants have ceased.

22  40.   On information and belief, each of the Defendants were acting in
23  concert with and in conspiracy with each and every one of the remaining Defendants.

24  41.   By virtue of all of the foregoing, adherence to the fiction of the separate
25  corporate existence of C&D Micro and ECT would, under the circumstances, permit
26  abuse of the corporate privilege and would sanction a fraud in that the individual
27  Defendants caused funds from the corporations to be withdrawn or depleted without
28  any consideration to the corporations, all for the purpose of avoiding and preventing

1  attachment and execution by its creditors, including Dogtra, and produce an

2  inequitable result because, among other reasons, Dogtra would be unable to realize

3  upon any judgment in its favor.

4     42. On information and belief, Defendants operate an on-line journal

5  concerning dog collars entitled "E-Collar – Greg Van Curen"

6  (https://gregvancuren.wordpress.com/).  This on-line journal contains at least six

7  hyperlinks that lead directly to various pages on  www.ecollar.com.  The six

8  hyperlinks leading directly to various pages on www.ecollar.com are entitled

9  "Ecollar.com", "All Products", "Dog Training Collars", "Hunting Training Collars",

10  "FAQ", and "Contact."

11     43. On information and belief, in 2013, Defendants published an article in

12  the "E-Collar – Greg Van Curen" journal.  This article contained false and

13  defamatory statements that harmed Dogtra's business and reputation, as well as

14  false statements disparaging Dogtra's products.  The article falsely asserted and

15  suggested that Dogtra is a Chinese company, that it created inferior quality collars

16  that risked the well-being of pets, and that Dogtra supported the abuse of household

17  pets.

18     44. On information and belief, Defendants published the aforesaid article

19  with the malicious intent of harming Dogtra's business and with the purpose of

20  funneling Dogtra's existing and prospective customers toward Defendants. The

21  publication remains on the blog and continues to contain false and defamatory

22  statements.

23  **FIRST CAUSE OF ACTION**

24  **MISAPPROPRIATION OF TRADE SECRETS**

25  **(California Civil Code §§ 3425 *et seq*., against all defendants)**

26     45. Dogtra incorporates by reference the allegations of paragraphs above as

27  though fully set forth herein.

28

2131-1002 / 543270.1

1.     At all relevant times herein, Defendant Mark So was an owner, investor, officer, employee, and/or agent of C&D Micro.  At all relevant times herein, Mark So was also an owner, investor, officer, employee, and/or agent of ECT.

2.     At all relevant times herein, Defendant Greg Van Curen was an owner, investor, officer, and/or agent of ECT.  At all relevant times herein, Greg Van Curen was also an owner, investor, officer, employee, and/or agent of C&D Micro.

3.     At all relevant times herein, C&D Micro authorized and had full knowledge of Mark So and Greg Van Curen's conduct.  Specifically, C&D Micro knew that Defendants Mark So and Greg Van Curen had provided C&D Micro with information that was misappropriated from Dogtra.

4.     At all relevant times herein, ECT authorized and had full knowledge of Mark So and Greg Van Curen's conduct.  Specifically, ECT knew that Defendants Mark So and Greg Van Curen had provide ECT with information that was misappropriated from Dogtra.

**A.**    **Defendant Mark So Was Vice-President of Dogtra and Learned Its Trade Secrets**

5.     From 1999 to December 31, 2010, Mark So was a Vice-President, employee, and/or agent of Dogtra.

6.     During Mark So's employment with Dogtra, he managed, controlled, had knowledge of and/or had access to Dogtra's confidential and proprietary information (collectively "Dogtra Trade Secrets") including, without limitation, the following:

    (i)    product technology, research and development ("R&D"), testing, and other product development-related information;

    (ii)    component and parts suppliers, manufacturing methods, schedules,  specifications, quality control, and other production-related information;

    (iii)    international shipping, import procedures, customs, delivery methods, and other shipping-related information;

2131-1002 / 543270.1

1           (iv)   distribution, sales, marketing, promotions, trade shows, and other

2   sales-related information;

3           (v)   customer service issues, solutions, best-practices, and other after-

4   service related information;

5           (vi)   revenue, profits, costs, expenses, losses, financial plans, analysis,

6   and other finance-related information;

7           (vii)   strategic plans, schedules, goals, and other planning-related

8   information;

9           (vii)   histories and contact information for employees that worked in

10   product development, manufacturing, distribution, sales, marketing, and other areas

11   of Dogtra's business;

12           (viii)  histories and contact information for consultants and dog trainers

13   who worked with Dogtra;

14           (ix)   histories and contact information for individuals and companies

15   related to Dogtra's R&D, manufacturing, and shipping; and

16           (x)   histories and contact information for individuals and companies

17   related to Dogtra's sales, distribution, and marketing including customer lists and

18   contacts.

19        7.   Defendant Mark So was involved in Dogtra's manufacture, importation,

20   distribution, sale, marketing, promotion, and/or customer service of products

21   containing technology disclosed in the '908 patent.  Said products were sold in this

22   District and elsewhere.

23        8.   In or about April 2009, Defendant Mark So changed his position at

24   Dogtra from Vice-President to Advisor.  Mark So's main responsibility as Advisor

25   was to advise and assist the next generation of the family takeover management of

26   Dogtra Korea and Dogtra USA respectively.

27        9.   Defendant Mark So ceased to be an employee of Dogtra on December

28   31, 2010.

2131-1002 / 543270.1

**B.** **While Still Employed at Dogtra, Defendant Mark So Shared Dogtra Trade Secrets And Developed a Prototype Electronic Training Collar with Another Company**

10.    On information and belief, in Summer 2009 while still employed at Dogtra, Defendant Mark So began work with Daehan Jeonja, also known as Trans One, a corporation located in South Korea.

11.    On information and belief, in Summer 2009, Mark So met with Daehan about developing and selling electronic dog training collars on behalf of Daehan. Before 2009, Daehan had not previously produced or sold electronic trainings collars.

12.    On information and belief, after meeting with Daehan, Defendant Mark So, in conjunction with other Defendants, including Greg Van Curen, assisted Daehan develop its first prototype of an electronic training collar for dogs ("Prototype Collar").  Among other things, Defendants, through Mark So, advised Daehan on certain design features and technical specifications of the Prototype Collar; Mark So managed field tests of said collar; Mark So and Greg Van Curen advised Daehan on sales and distribution channels for said collar in the United States; and Mark So and Greg Van Curen promised to market and sell said collar in the United States for Daehan.

13.    On information and belief, Defendants, including Mark So, carried out the aforementioned work by utilizing Dogtra's Trade Secrets and sharing said secrets with individuals at Daehan including, without limitation, the confidential and proprietary information, methods, designs, and technology disclosed in the '908 patent.

14.    On information and belief, two Dogtra engineers ceased employment at Dogtra in or about July 2009 and started work at Daehan with Mark So.  Both Dogtra engineers previously worked with Mark So in developing electronic dog training collars at Dogtra.

2131-1002 / 543270.1

15.     On information and belief, Daehan spent considerable time and money developing the Prototype Collar.  On information and belief, Daehan would not have undertaken the considerable task of developing the Prototype Collar (i) without Mark So advice and assistance on the design and technical features of said collar, and (ii) without Mark So and Greg Van Curen's representations that he would utilize the information, contacts and other Dogtra Trade Secrets he possessed to sell, distribute, and market the Prototype Collar in the United States.

16.     On information and belief, in Fall or Winter 2010, Defendant Mark So took the Prototype Collar to the United States as a sample to show potential wholesale customers, to show dog trainers who could act as potential product promoters, and to show other potential business partners or investors.

**C.     While Still Employed at Dogtra, Mark So Schemed with Greg Van Curen To Establish C&D Micro and E-Collar Technologies To Directly Compete with Dogtra**

17.     On information and belief, during the same trip in Fall or Winter 2010, Mark So showed Greg Van Curen the Prototype Collar.

18.     On information and belief, after seeing the Prototype Collar, Defendants Mark So and Greg Van Curen further conspired and agreed to produce, distribute, and sell electronic dog training collars for themselves without Daehan.

19.     On information and belief, Mark So ended his employment with Dogtra on December 31, 2010.

20.     On information and belief, Mark So stopped working with Daehan in our about the same time.

21.     On information and belief, Mark So, Greg Van Curen, and/or Does 1-10 established C&D Micro and E-Collar Technologies in April 2011 and May 2011 respectively.

22.     On information and belief, Defendant C&D Micro was established in South Korea to develop, manufacture, and supply electronic training collars for dogs solely to ECT in the United States.

23.     On information and belief, Defendant ECT was established in the State of Indiana to market, promote and sell electronic training collars for dogs in the United States, with products supplied solely by C&D Micro.

24.     The above businesses of C&D Micro and ECT directly compete with Dogtra's business of electronic training collars for dogs.

> **D.    Defendants Utilized Dogtra's Stolen Trade Secrets and Ex-Dogtra Employees To Develop, Manufacture, and Supply Electronic Training Collars for Sale by ECT in the U.S.**

25.     On information and belief, Defendants utilized certain stolen Dogtra Trade Secrets to develop, manufacture, and supply electric training collars for sale by ECT in the United States including this jurisdiction.  Said Dogtra Secrets include, without limitation:

(i)     Dogtra's product technology, research and development, testing, and other product development-related information including, but not limited to, those related to the '908 patent;

(ii)     Dogtra's component and parts suppliers, manufacturing methods, schedules, specifications, schedules, quality control, and other production-related information; and

(iii)     Dogtra's international shipping, export-import procedures, customs, delivery methods, and other shipping-related information.

26.     On information and belief, in Winter 2010, Defendant Mark So approached the two ex-Dogtra employees who worked with Mark So at Daehan Jeonja to leave said company and work for the soon-to-be-established C&D Micro.

2131-1002 / 543270.1

27.     On information and belief, in or about the same time period, Defendant Mark So and/or his agents also approached at least one or more existing Dogtra engineers to leave Dogtra and work for C&D Micro.

28.     On information and belief, in or about March 2011, the above former Dogtra Engineers (collectively "Ex-Dogtra Engineers") started work for C&D Micro, one month prior to said C&D Micro's formal incorporation.

29.     The Ex-Dogtra Engineers previously worked in product development at Dogtra.

30.     On information and belief, utilizing the above Dogtra Trade Secrets and the Ex-Dogtra Engineers, Defendants developed and manufactured a new line of electronic training collars for dogs.

31.     On information and belief, Defendants were able to develop and manufacture said electronic training collars at less cost and in less time than normal for a new business venture because Defendants utilized Dogtra Trade Secrets and the ex-Dogtra Engineers.

32.     On information and belief, Defendants began supplying said electronic training collars to ECT ("Misappropriated Products") by Fall 2011.

33.     Dogtra never authorized Defendants' use of the above Dogtra Trade Secrets in any manner.

**E.     Defendants Marketed, Promoted, and Sold the Misappropriated Products in the United States.**

34.     On information and belief, Defendants Greg Van Curen and ECT received the Misappropriated Products from Defendants Mark So and C&D Micro and utilized certain stolen Dogtra Trade Secrets to market, promote, and sell the Misappropriated Products in the United States including this jurisdiction.  Said Dogtra Trade Secret include, without limitation:

(i)     Dogtra's international shipping, export-import procedures, customs, delivery methods, and other shipping-related information;

(ii)     Dogtra's distribution, sales, marketing, promotions, trade shows, and other sales-related information; and

(iii)    Dogtra's customer service issues, solutions, best-practices, and other after-service related information.

35.    On information and belief, Defendants marketed, promoted, and/or sold the Misappropriated Products beginning in our about September 2011.

36.    On information and belief, Defendants were able to market, promote, and sell the Misappropriated Products at less cost and in less time than normal for a new business venture because Defendants utilized Dogtra Trade Secrets.

37.    Dogtra never authorized Defendants' use of the above Dogtra Trade Secrets in any manner.

**F.     Defendants Utilized Other Stolen Dogtra Trade Secrets To Gain a Competitive Advantage Over Dogtra**

38.    On information and belief, Defendants utilized other stolen Dogtra Trade Secrets to gain a competitive advantage over Dogtra.  These other Dogtra Trade Secrets include, without limitation:

(i)     Dogtra's revenue, profits, costs, expenses, losses, financial plans, analysis, and other finance-related information;

(ii)    Dogtra's strategic plans, schedules, goals, and other planning-related information;

(iii)   the histories and contact information for employees that worked in product development, manufacturing, distribution, sales, marketing, and other areas of Dogtra's business;

(iv)    the histories and contact information for consultants and dog trainers who worked with Dogtra;

(v)     the histories and contact information for individuals and companies related to Dogtra's R&D, manufacturing, and shipping; and

(vi)    the histories and contact information for individuals and

1   companies related to Dogtra's marketing, promotion, and sales including customer
2   lists and contacts.

3     39. On information and belief, Defendants were able to develop,
4   manufacture, export-import, market, promote, and sell the Misappropriated Products
5   at less cost and in far less time than normal for a new business venture because
6   Defendants utilized the above Dogtra Trade Secrets.

7     40. Dogtra never authorized said Defendants use of the above Dogtra Trade
8   Secrets in any manner.

9     **G.** **The Dogtra Trade Secrets Were Confidential, Proprietary,**
10     **and Not Available to Dogtra's Competitors Nor the General**
11     **Public.**

12    41. At all times relevant herein, Dogtra derived independent economic
13  value from the Dogtra Trade Secrets, and said Trade Secrets was not known by
14  Dogtra's competitors nor the general public.

15    42. At all times relevant herein, Dogtra exercised reasonable care in
16  maintaining the confidentiality and propriety of the Dogtra Trade Secrets.  Dogtra
17  shared said Trade Secrets only with known and trusted employees, officers, and/or
18  agents of the company.  Furthermore, access to the Dogtra Trade Secrets was strictly
19  limited to a need-to-know basis.

20    43. The Dogtra Trade Secrets, therefore, constitute trade secrets protectable
21  under California Civil Code §§ 3426 et seq.

22    **H.** **Dogtra Was Damaged by the Misappropriation of the Dogtra**
23     **Trade Secrets by Defendants**

24    44. On information and belief, Defendants maliciously schemed to obtain
25  the Dogtra Trade Secrets and utilized said Trade Secrets, as described above, to
26  establish new business ventures and to sell electronic training collars unfairly and in
27  direct competition with Dogtra.

28

2131-1002 / 543270.1

45.     But for Defendants' improper and unfair conduct, Defendants would not have been able to obtain and utilize the Dogtra Trade Secrets.

46.     On information and belief, Defendants misappropriated the Dogtra Trade Secrets by disclosing said Trade Secrets to others and/or by utilizing said trade secrets in furtherance of their business ventures without Dogtra's express or implied consent.

47.     On information and belief, Defendants and/or Does 1-10 knew, or had reason to know, that information provided by Mark So included trade secrets that had been misappropriated from Dogtra.

48.     Defendants and Does 1-10 are liable for their own actions as well as for one another's actions under, among other doctrines, the doctrine of *respondeat superior*.

49.     As a consequence of the misappropriation of the Dogtra Trade Secrets by Defendants and/or Does 1-10, Dogtra has been damaged in an amount according to proof.

## SECOND CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
#### (Against Defendant Mark So)

46.     Dogtra incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth here.

47.     At all relevant times herein, Mark So was employed as a vice president or other officers of Dogtra and therefore owed fiduciary duties to Dogtra.

48.     Mark So breached his duty of loyalty to Dogtra when he usurped corporate opportunities, engaged in interested transactions to directly compete against Dogtra, and breached confidentiality relating to Dogtra's trade-sensitive and confidential business information.

49.     On information and belief, Mark So acted, or was supposed to act, on behalf of Dogtra in a wide range of capacities.  Said capacities included, without

limitation, planning, management, coordination, and other decision-making responsibilities relating to product development, manufacturing, distribution, sales, marketing, advertising, and customer service for Dogtra and its products.

50.     On information and belief, Mark So usurped Dogtra's business opportunities for his own personal and financial gain by failing to disclose potential ventures or business opportunities to Dogtra.

51.     On information and belief, in or about 2009, Mark So became involved with certain individuals or representatives from one or more third parties, including Daehan and Greg Van Curen, to develop, manufacture, and sell new electronic training collars that may offer competitive advantage in performance, feature or other appeal. Mark So, instead of directing the business opportunity to Dogtra, usurped the opportunity by forming C&D Micro and ECT to compete directly against Dogtra.

52.     Mark So, collectively with other named Defendants, also usurped Dogtra's business opportunities by filing, individually or jointly with other Defendants, patent applications based on the technology and expertise he gained through years of employment with Dogtra. Mark So filed no fewer than 5 patent applications within one year of his departure from Dogtra, including one that was filed while still employed by Dogtra, entitled "Remote Animal Training System Using Voltage-To-Frequency Conversion." The patents all relate to technology used in electronic dog collars. Mark So's conduct deprived Dogtra of opportunities to develop into the relevant state of the art covered by those patent applications.

53.     On information and belief, Mark So also breached his duty of loyalty by engaging in interested transactions against Dogtra. Such interested transactions include but are not limited forming new corporations to create products to directly compete against Dogtra, misuse of corporate resources for personal affairs, and use of his time during his employment at Dogtra to develop products for and with Greg Van Curen, Daehan, C&D Micro and ECT.

2131-1002 / 543270.1

54.     On information and belief, Mark So actively conducted, managed and assisted such third parties in creating and testing prototype training collars during Mark So's employment at Dogtra.

55.     On information and belief, Mark So, while serving as a high-level officer of Dogtra, active recruited current and past employees of Dogtra to work for Defendants.

56.     On information and belief, Mark So used Dogtra's resources and contacts to conduct field testing of the new products for Defendants—all without disclosure to Dogtra.

57.     On information and belief and as discussed in the foregoing sections of the Complaint, Mark So frequently used Dogtra employees to run his personal errands, thereby depriving Dogtra of resources needed for actual work in the company's best interest.

58.     Dogtra did not consent to any of the above conduct or to any activities of Mark So.  Dogtra was not aware of Mark So's misconduct until after Mark So had left Dogtra to form C&D and ECT.

59.     As a result of the above breaches of fiduciary duty, Dogtra has been damaged in an amount according to proof.  Dogtra was harmed, and the conduct and activities of Mark So was a substantial factor in causing said harm to Dogtra.

60.     Dogtra is entitled to punitive damages because Defendants' actions in breaching their fiduciary duties were carried out maliciously, with the intent to harm Dogtra, and without regard to the rights of Dogtra.  Mark So in particular harbored ill will and malice toward Dogtra because he believed that he was unfairly denied the opportunity to take control of Dogtra .

### THIRD CAUSE OF ACTION

### DEFAMATION

### (Against Defendants Greg Van Curen and ECT)

61.     Dogtra incorporates by reference each and every allegation contained in

2131-1002 / 543270.1

the paragraphs above as though fully set forth here.

62. On information and belief, on January 19, 2013, Defendants published in their on-line journal, "E-Collar – Greg Van Curen," an article entitled "Beware of imported collars" (the "January 19, 2013 Article"). The January 19, 2013 Article is published to readers who are potential buyers of electronic training collars, and thus, the January 19, 2013 Article is published to potential customers of both Dogtra and Defendants.

63. The January 19, 2013 Article explicitly and implicitly asserted the following false and defamatory statements: (1) Dogtra's products place the reader's "dog's well-being" at risk and (2) Dogtra's products are "made in China" such that purchasing Dogtra products supports mistreatment of dogs because people in China consume dogs and cats.

64. The January 19, 2013 Article directs the potential customers of electronic training collars to "[s]ee the truth … by clicking on the 2 [sic] YouTube icons below", and rhetorically asks "Why would an animal lover buy a pet product made in China?" The YouTube icons hyperlink to: (1) a video purporting to be of an English celebrity consuming dog meat in China; and (2) a video purporting to concern mistreatment of dogs and cats in China.

65. The YouTube icons of the January 19, 2013 Article, along with language concerning the hyperlinked videos are reasonably understood as implying that Dogtra is a Chinese company that promotes abuse and consumption of pets, including of dogs.

66. Defendants knew that the explicit and implicit false and defamatory statements published in the January 19, 2013 Article were, and are, untrue and/or acted with reckless disregard of the truth or falsity of these statements.

67. Defendants maliciously and intentionally published and/or authorized the publication of the provably false and defamatory statements of the January 19, 2013 Article, so as to harm Dogtra's business reputation in the dog collar industry.

2131-1002 / 543270.1

68. The false and defamatory statements published by Defendants in the January 19, 2013 Article are unprivileged.

69. The false statements published by Defendants in the January 19, 2013 Article have a natural tendency to injure and are per se defamatory because these statements harm Dogtra's business reputation.

70. Dogtra has suffered harm to its business reputation as a result of the provably false and defamatory statements made by Defendants in the January 19, 2013 Article.

71. Because Defendants' actions to defame Dogtra through the publication of false and defamatory statements were malicious, intentional, and without regard to the rights of Dogtra, Dogtra is entitled to punitive damages.

## FOURTH CAUSE OF ACTION

### TRADE LIBEL

### (Against Greg Van Curen and ECT)

72. Dogtra incorporates by reference each and every allegation contained in preceding paragraphs as though fully set forth here.

73. The January 19, 2013 Article warned potential customers of electronic training collars to "[b]eware" of "e-collar brands imported from Asia such as … Dogtra."

74. The January 19, 2013 Article explicitly asserted the provably false and defamatory statement that Dogtra's products place the reader's "dog's well-being" at risk.

75. The January 19, 2013 Article's aforementioned warning and explicit statement are reasonably understood as implying the provably false and defamatory statement that Dogtra, an Asian company, produces inferior products *vis-à-vis* ECT's products, at least when the two company's respective products are evaluated by the criterion of dog "well-being."

76. Defendants knew that the explicit and implicit false and defamatory

statements published in the January 19, 2013 Article were, and are, untrue and/or acted with reckless disregard of the truth or falsity of these statements.

77.     Defendants knew and/or have reasons to know that potential customers of electronic training collars have, and will continue to, rely on the false and defamatory statements published in the January 19, 2013 Article.

78.     Defendants maliciously and intentionally published and/or authorized the publication of the provably false and defamatory statements of the January 19, 2013 Article, so as to disparage the quality of Dogtra's goods.

79.     The false and defamatory statements published by Defendants in the January 19, 2013 Article are unprivileged.

80.     The false and defamatory statements published by Defendants in the January 19, 2013 Article have a natural tendency to injure and are per se defamatory because these statements harm Dogtra's business reputation and disparage the quality of Dogtra's goods.

81.     Dogtra is an established business, and has been an established business since 1984.

82.     The false statements published by Defendants in the January 19, 2013 Article induced existing customers to stop dealing with Dogtra, and induced prospective customers to not deal with Dogtra.

83.     The false statements published by Defendants in the January 19, 2013 Article caused Dogtra to suffer special damages in the form of pecuniary losses. Dogtra has lost both existing and prospective customers as a result of the false and disparaging statements made in the January 19, 2013 Article.

84.     Following publication of the January 19, 2013 Article, Dogtra's sales revenue increased at neither the same nor anticipated rate.  This is a natural and probable result of the publication of the January 19, 2013 Article because the article's disparaging statements induced existing and prospective customers (1) not to deal with Dogtra and to (2) deal with Defendants.

2131-1002 / 543270.1

85.     On information and belief, Defendants' revenue increased and Dogtra's sales for competing products were affected following publication of the January 19, 2013 Article.  This is a natural and probable result of the publication of the January 19, 2013 Article because the article's disparaging statements induced existing and prospective customers (1) not to deal with Dogtra and to (2) deal with Defendants.

86.     Because Defendants' actions to disparage Dogtra's products through the publication of false and defamatory statements were malicious, intentional, and without regard to the rights of Dogtra, Dogtra is entitled to punitive damages.

## FIFTH CAUSE OF ACTION

## INTENTIONAL INDUCEMENT FOR BREACH OF CONTRACT

### (Against All Defendants)

87.     Dogtra incorporates by reference each and every allegation contained in paragraphs above as though fully set forth here.

88.     Various employees left Dogtra Korea to collaborate with Defendants ("Departed Employees").

89.     When employees leave Dogtra Korea, they are generally requested to sign a Separation Agreement, a valid and enforceable contract.

90.     Dogtra Korea's Separation Agreement contains a Non-Disclosure Provision requiring the Departed Employee to refrain from any unauthorized use or disclosure of Dogtra's proprietary or confidential information or materials, which include technical information of Dogtra product designs and plans.

91.     On information and belief, Defendants knew of each Separation Agreement, including of each Separation Agreement's Non-Disclosure Provision, through Mark So, who is professionally acquainted with Departed Employee via his employment at Dogtra.

92.     On information and belief, Defendants intentionally induced breach of each Departed Employee's Separation Agreement by persuading Departed Employee to disclose and use, without authorization, Dogtra's proprietary and/or

2131-1002 / 543270.1

1    confidential information.

2        93.    On information and belief, Departed Employees had in fact disclosed

3    and used, without authorization, Dogtra's proprietary and/or confidential

4    information, in breach of their respective Non-Disclosure Provisions.

5        94.    On information and belief, the Departed Employees' breaches of their

6    respective Non-Disclosure Provisions were caused by Defendants' unjustified and

7    wrongful conduct.

8        95.    Dogtra suffered damages as a result of the Defendants' inducements of

9    breaches of the Non-Disclosure Provisions, including competitive harm, harm to

10   Dogtra's ability to develop new products, and harm to Dogtra's ability to obtain

11   quality components to its products.

12                          **SIXTH CAUSE OF ACTION**

13   **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

14                          **(Against All Defendants)**

15       96.    Dogtra incorporates by reference each and every allegation contained in

16   the paragraphs above as though fully set forth herein.

17       97.    Dogtra Korea had valid and enforceable employment contracts with

18   Departed Employees.

19       98.    On information and belief, Defendants had knowledge of Dogtra's

20   contractual relations with Departed Employees via Mark So, who is professionally

21   acquainted with Departed Employees via his employment at Dogtra.

22       99.    On information and belief, Defendants committed intentional and

23   unjustified acts designed to interfere with or disrupt Dogtra's contractual relations

24   with Departed Employees and ultimately poached these employees from Dogtra.

25       100.   On information and belief, Defendants did not simply extend job offers

26   to Departed Employees.  Instead, Defendants engaged in unlawful acts with the

27   intent to injure Dogtra's business operations and cause Departed Employees to end

28   their contractual relations with Dogtra.

2131-1002 / 543270.1

101.   On information and belief, the unlawful acts Defendants engaged in to injure Dogtra's business, so as to disrupt or interfere with Dogtra's contractual relations with Departed Employees, include misappropriating, using, and disclosing proprietary and/or confidential information, which was acquired via breach of fiduciary duties, and improperly soliciting Dogtra's clients and suppliers.

102.   Defendants' conduct had actually interfered with or disrupted Dogtra's contractual employee relations, because Departed Employees left Dogtra Korea to collaborate with Defendants in businesses that availed themselves of Dogtra's proprietary and/or confidential information to directly compete with Dogtra.

103.   Dogtra suffered damages as a result of Defendants' conduct, including harm resulting from the slowing of Defendants' product development, the expenses incurred in replacing the Departed Employees, and the misappropriation and use of Dogtra's proprietary and/or confidential information.

104.   On information and belief, even after the Departed Employees left Dogtra Korea, Defendants have continued to engage in unlawful and unjustified conduct, with the intent of poaching Dogtra's employees and interfering with Dogtra's contractual relations with said employees.

105.   Dogtra had valid and enforceable contracts with various suppliers of components used in manufacturing Dogtra's products.

106.   On information and belief, Defendants had knowledge of Dogtra's contractual relations with its suppliers via Mark So, who is professionally acquainted with Dogtra's suppliers via his employment at Dogtra.

107.   On information and belief, Defendants committed intentional and unjustified acts designed to interfere with or disrupt Dogtra's contractual relations with Dogtra's suppliers by encouraging the sharing of Dogtra's proprietary and/or confidential information among the Defendants and Dogtra's suppliers.

108.   On information and belief, Defendants did not simply contract with Dogtra's suppliers.  Instead, Defendants engaged in unlawful acts with the intent to

1   injure Dogtra's business operations and disrupt Dogtra's contractual relations with

2   Dogtra's suppliers.

3       109.   On information and belief, the unlawful acts Defendants engaged in to

4   injure Dogtra's business, so as to disrupt or interfere with Dogtra's contractual

5   relations with Dogtra's suppliers, include misappropriating, using, and disclosing

6   Dogtra's proprietary and/or confidential information, such as supplier lists and other

7   intellectual property acquired in breach of  fiduciary duties, and improperly

8   soliciting Dogtra's clients and suppliers.

9       110.   Defendants' conduct had actually interfered with or disrupted Dogtra's

10  contractual relations with its suppliers because Dogtra's proprietary and/or

11  confidential information was actually being leaked by, and shared among, the

12  Defendants and Dogtra's supplies.

13      111.   Dogtra suffered damages as a result of Defendants' conduct, including

14  harm resulting from Dogtra's need to switch suppliers, so as to protect its

15  proprietary and/or confidential information.

16      112.   On information and belief, Defendants committed intentional and

17  unjustified acts designed to interfere with or disrupt Dogtra's contractual relations

18  with its customers and ultimately poached these customers from Dogtra.

19      113.   Dogtra suffered damages as a result of Defendants' conduct, because of

20  unanticipated disruption in the supply chain costs significant losses in overall

21  productivity.

## SEVENTH CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH

### PROPSPECTIVE ECONOMIC ADVANTAGE

### (Against All Defendants)

26      114.   Dogtra incorporates by reference each and every allegation contained in

27  the paragraphs above as though fully set forth herein.

28      115.   Dogtra had valid and enforceable employment contracts with Departed

1 Employees, and therefore had an economic relation with each of the Departed

2 Employees that contained the probability of a future economic benefit.

3     116.  On information and belief, Defendants had knowledge of Dogtra's

4 economic relations with Departed Employees via Mark So, who is professionally

5 acquainted with these employees via his employment at Dogtra.

6     117.  On information and belief, Defendants committed intentional and

7 unjustified acts designed to interfere with or disrupt  Dogtra's economic relations

8 with Departed Employees and ultimately poached these employees from Dogtra.

9     118.  On information and belief, Defendants did not simply extend job offers

10 to Departed Employees. Instead, Defendants engaged in unlawful acts with the

11 intent to cripple Dogtra's business operations and disrupt Dogtra's economic

12 relations with Departed Employees.

13     119.  On information and belief, the unlawful acts Defendants engaged in to

14 cripple Dogtra's business, so as to disrupt or interfere with Dogtra's economic

15 relations with Departed Employees, include misappropriating, disclosing, and using

16 proprietary and/or confidential information and improperly soliciting Dogtra's

17 clients and suppliers.

18     120.  Defendants' conduct had actually interfered with or disrupted Dogtra's

19 economic relations with Departed Employees, because Departed Employees left

20 Dogtra Korea to collaborate with Defendants in businesses that availed themselves

21 of Dogtra's proprietary and/or confidential information to directly compete with

22 Dogtra..

23     121.  Dogtra suffered damages as a result of Defendants' conduct, including

24 harm resulting from the slowing of Defendants' product development, the expenses

25 incurred in replacing Departed Employees, and the misappropriation and use of

26 Dogtra's proprietary and/or confidential information.

27     122.  Dogtra suffered damages as a result of Defendants' conduct, including

28 harm resulting from Dogtra's need to switch suppliers, so as to protect its

proprietary and/or confidential information.

123.   On information and belief, Defendants continue to engage in unlawful and unjustified conduct, with the intent of interfering with Dogtra's economic relations with its customers.

### EIGHTH CAUSE OF ACTION

### NEGLIGENT INTERFERENCE WITH

### PROPSPECTIVE ECONOMIC ADVANTAGE

### (Against All Defendants)

124.   Dogtra incorporates by reference each and every allegation above as though fully set forth herein.

125.   A special relationship exists between Dogtra and Defendants because Dogtra was a fiduciary of Mark So, a former high-ranking officer within Dogtra who had access to Dogtra's proprietary and/or confidential information.

126.   Dogtra had an economic relation with each of the Departed Employees and suppliers who were replaced as a result of Mark So's interference that contained the probability of a future economic benefit.

127.   On information and belief, Defendants, through Mark So, had knowledge of Dogtra's economic relations with Departed Employees.

128.   On information and belief, Defendants knew or should have known that if they did not act with due care, their actions would interfere with or disrupt Dogtra's economic relations with Departed Employees and suppliers and cause Dogtra to lose in whole or in part the probable future economic benefit or advantage of those relationships.

129.   Defendant either actively conspired with or negligently aided and abetted Mark So in luring away the Departed Employees from Dogtra as part of Mark So's plan, in breach his fiduciary duties, to misappropriate Dogtra's proprietary and/or confidential information and usurp business opportunities from Dogtra.

130.   Defendants' negligence harmed Dogtra's economic relations with Departed Employees, because Departed Employees left Dogtra Korea to collaborate with Defendants in businesses that availed themselves of Dogtra's proprietary and/or confidential information to directly compete with Dogtra.

131.   Dogtra suffered damages as a result of Defendants' negligence, including harm resulting from the slowing of Defendants' product development, the expenses incurred in replacing Departed Employees and various suppliers, and the misappropriation and use of Dogtra's proprietary and/or confidential information.

132.   On information and belief, knew or should have known that if they did not act with due care, their actions would interfere with or disrupt  Dogtra's economic relations with with its suppliers by encouraging the sharing of Dogtra's proprietary and/or confidential information among the Defendants and Dogtra's suppliers.

133.   Dogtra suffered damages as a result of Defendants' negligence, because Dogtra was forced to replace the employees and to retain new suppliers at a significant economic loss, such as lost profits and consequential damages.

## NINTH CAUSE OF ACTION

### INFRINGEMENT OF U.S. PATENT NO. 5,666,908

### (Pursuant to 35 U.S.C. § 271, Against All Defendants)

134.   Dogtra USA incorporates by reference each and every allegation contained in preceding paragraphs as though fully set forth herein.

135.   Dogtra USA is the sole assignee of U.S. Patent No. 5,666,908 ("the '908 patent") and therefore owns the entire right, title, and interest for the '908 patent.

136.   The application for the '908 patent was filed on July 5, 1995.

137.   The sole inventor of the '908 patent is Ho Yun So ("Inventor So"). The '908 patent was duly issued to Inventor So on September 16, 1997.

138.   Inventor So assigned the entire right, title, and interest for the '908

2131-1002 / 543270.1

1  patent to Dogtra USA on April 19, 2011.

2      139.   On information and belief, Defendants have infringed claims 1 and 6 of

3  the '908 patent by making, using, importing, offering to sell, and selling in the

4  Central District of California (this "District") and elsewhere electronic training

5  collars for dogs utilizing technology, methods, and designs disclosed in the '908

6  patent.

7      140.   On information and belief, infringing products include ECT's remotely

8  operated ET-700 electronic training collar (the "ET-700 system"), ECT's remotely

9  operated ET-500 electronic training collar (the "ET-500 system"), and ECT's

10  remotely operated ET-800 electronic training collar (the "ET-800 system").  On

11  information and belief, infringing products also include variants of and successors to

12  these three named products.

13              **(1).   Infringement by the ET-700 System**

14      141.   ECT offered for sale the ET-700 system through its former website

15  (http://e-collar.net).  The ET-700 system remained available for purchase from third-

16  party sellers as of December 5, 2015. The system includes, among other things, a

17  remote transmitter, a receiver coupled to a collar, with two protruding electrodes on

18  the receiver.

19              **(2).   Infringement of Independent Claim 1**

20      142.   On information and belief, each element within claim 1 of the '908

21  patent ("Claim 1") can be matched to at least one component in the ET-700 system.

22  On information and belief, the ET-700 system therefore infringes Claim 1.

23      143.   The preamble of Claim 1 defines the invention as a "system for

24  conditioning behavior in an animal using electrical stimulation."  The ET-700

25  system fits this description.

26      144.   Claim 1 defines the invention as having a "transmitter" and a "collar."

27  The remote control and collar of the ET-700 system respectively fit these

28  descriptions.

2131-1002 / 543270.1

145.   Claim 1 defines the "transmitter" as "having a control switch for selecting a level of electrical stimulation and means for producing radio signals responsive to a power switch, the radio signals including an indication of the selected level of electrical stimulation" (emphasis added).

146.   The remote control of the ET-700 system (the "ET-700 remote") has features corresponding to each of these elements, including a dial for selecting different levels of stimulation.

147.   Claim 1 defines the "collar" as "including electrodes arranged to be brought into proximity to the skin of an animal wearing the collar and a receiver unit coupled to the electrodes for generating electrical stimulation at the electrodes responsive to the radio signals" (emphasis added).

148.   The collar of the ET-700 system (the "ET-700 collar") has electrodes on the receiver with features corresponding to each of these elements.

149.   Claim 1 defines the "receiver unit" as having a "radio signal detection means for detecting the radio signals and determining the indication of the selected level of electrical stimulation from the detected radio signals" (emphasis added). The ET-700 collar has a receiver with features corresponding to each of these elements.

150.   Claim 1 defines the "receiver unit" as having a "processor coupled to the radio signal detection means and including a control program stored in an associated memory, the control program generating a first train of signal pulses, each pulse of the first pulse train having a pulse width determined by the indication of the selected level of electrical stimulation." The ET-700 collar has features corresponding to each of these elements.

151.   An analysis of the circuit design of the ET-700 collar reveals the existence of a processor with memory and "first train of signal pulses." On information and belief, each pulse in the "first train of signal pulses" has a "pulse width determined by the indication of the selected level of electrical stimulation."

2131-1002 / 543270.1

152.   Claim 1 defines the "receiver unit" as having a "power amplifying circuit having an input coupled to receive the first train of signal pulses and outputs coupled to the collar electrodes, for producing a second pulse train of amplified signal pulses at the collar electrodes wherein each pulse of the second pulse train has a signal strength determined by the width of a corresponding pulse of the first pulse train." The ET-700 collar has features corresponding to each of these elements.

153.   Analysis of the electrical output at the electrodes of the ET-700 collar indicates the existence of a "second pulse train of amplified signal pulses."

154.   Analysis of the electrical output at the electrodes of the ET-700 collar indicates that the strength of each pulse within the second train depends on the width of a corresponding pulse in the first train.

### (3).   Infringement of Independent Claim 6

155.   On information and belief, each step in claim 6 of the '908 patent ("Claim 6") can be matched to at least an event that occurs during the normal use of the ET-700 system.  On information and belief, the ET-700 system therefore infringes Claim 6.

156.   The preamble of Claim 6 defines the invention as a "method for conditioning the behavior of an animal wearing a radio-receiver collar using an electrical stimulation signal produced by a transmitter."  Use of the ET-700 system fits this description.

157.   The first step of the method is "programming a processor in the radio receiver collar to generate a first train of signal pulses in which each pulse has a width determined by an indication provided to the processor." Use of the ET-700 system fits this description.

158.   An analysis of the electrical output at the electrodes of the ET-700 collar shows that the collar "generate[s] a first train of signal pulses" when a stimulation is applied.  On information and belief, each pulse in the first train has a "width determined by an indication provided to the processor."

2131-1002 / 543270.1

159.   The second step of the method is "transmitting a control signal to the radio receiver collar including an indication of a level of electrical stimulation." Use of the ET-700 system fits this description.

160.   The third step of the method is "responsive to receipt of the control signal, applying the indication of the level of electrical stimulation to the processor to generate a first train of signal pulses having pulse widths determined by the indicated level of electrical stimulation." Use of the ET-700 system fits this description.

161.   Analysis of the electrical output at the electrodes of the ET-700 collar shows existence of a "first train of signal pulses." On information and belief, the width of each pulse within the first train is "determined by the indicated level of electrical stimulation."

162.   The fourth step of the method is "coupling the first train of signal pulses to a transformer to generate a second train of signal pulses, wherein the second train of pulses have peak to peak signal levels determined by the pulse widths of the first train of signal pulses."

163.   Analysis of the electrical output at the electrodes of the ET-700 collar shows a "first train of signal pulses" and a "second train of signal pulses." On information and belief, the "peak to peak signal levels" in the second train of signal pulses are "determined by the pulse widths of the first train of signal pulses." Use of the ET-700 system fits this description.

164.   The fifth and final step of the method is "applying the second train of signal pulses to skin of the animal at selected times to condition the animals behavior." Use of the ET-700 system fits this description.

165.   Analysis of the electrical output at the electrodes of the ET-700 collar shows that the second train of signals has a voltage of several hundred volts [get exact number]. This voltage is applied directly to the skin of the dog wearing the ET-700 collar upon operation of the ET-700 remote. Therefore, the ET-700 collar

"appl[ies] the second train of signal pulses to the skin of the animal at selected times."

### (4).   Infringement by the ET-500 System

166.   ECT produced and sold the remotely operated ET-500 electronic training collar (the "ET-500 system").

167.   The ET-500 system was sold on ECT's former website (http://e-collar.net).

168.   On information and belief, the design and operation of the ET-500 system are similar in all substantive respects to that of the ET-700 system.

169.   On information and belief, the ET-500 system therefore infringes claims 1 and 6 of the '908 patent.

### (5).   Infringement by the ET-800 System

170.   ECT produced and sold the remotely operated ET-800 electronic training collar (the "ET-800 system").

171.   The ET-800 system was sold on ECT's former website (http://e-collar.net).

172.   On information and belief, the design and operation of the ET-800 system are similar in all substantive respects to that of the ET-700 system.

173.   On information and belief, the ET-800 system therefore infringes claims 1 and 6 of the '908 patent.

### (6).   Infringement by Other Products Made by ECT

174.   ECT currently offers numerous products that appear to have substantial similarities to the ET-500, ET-700, and ET-800 systems.  On information and belief, these products also infringe claims 1 and 6 of the '908 patent.

### TENTH CAUSE OF ACTION

### CONSPIRACY

### (Against All Defendants)

175.    Dogtra incorporates by reference each and every allegation contained

2131-1002 / 543270.1

in paragraphs above as though fully set forth herein.

176.   On information and belief, Defendants formed and operated a conspiracy to carry out the wrongful acts and omissions described above, including but not limited to the infringement of Dogtra's intellectual property, the misappropriation, disclosure, and use of Dogtra's proprietary and/or confidential information, to otherwise harm the rights and interests of Dogtra, to commit breach of fiduciary duties, and to disrupt or interfere with Dogtra's contractual and economic relations.

177.   On information and belief, the wrongful acts and omissions described above were, and are being, committed pursuant to the formation and operation of the conspiracy.

178.   Dogtra suffered damages resulting from the wrongful acts and omissions described above.

179.   Defendants' wrongful acts and omissions are malicious, intentional, and without regard to the rights of Dogtra as to warrant to punitive damages against Defendants.

## ELEVENTH CAUSE OF ACTION

## UNFAIR COMPETITION

## (Cal. Bus. and Prof. Code §§ 17200 *et seq.*, Against All Defendants)

180.   Dogtra incorporates by reference each and every allegation contained in the paragraphs above, inclusively, as though fully set forth here.

181.   The actions of Defendants, whether individually or as agents, representatives, or employees of one another, in breaching their fiduciary duty to Dogtra constitute unfair competition under California Business and Professions Code §§ 17200 *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SOS Co., Inc. dba Dogtra prays for judgment against defendants E-Collar Technologies, Inc., Hosung So, and Does 1–10 inclusive as

2131-1002 / 543270.1

follows:

1.    That the '908 patent was valid and enforceable;

2.    That Defendants infringed the '908 patent;

3.    That such infringement was willful;

4.    That Defendants and their subsidiaries, affiliates, parents, successors, assigns, officers, agents, representatives, servants, and employees, and all persons in active concert or participation with them, be preliminarily and permanently enjoined from unlawfully using Dogtra's patent, trade secrets and other confidential information;

5.    That Defendants be ordered to pay Dogtra damages, including but not limited to disgorgement of Defendants' profits, Dogtra's lost profits caused by Defendant's infringement of the '908 patents;

6.    That such damages be trebled, together with interest thereon;

7.    That this case be declared exceptional under 35 U.S.C. § 285 and that Dogtra be awarded its reasonable attorneys' fees and costs;

8.    That Defendants be ordered to pay Dogtra damages according to proof, including damages to restore Dogtra as nearly as possible to the condition in which he or she would have been without (1) Defendant's defamation and trade libel; and (2) Defendant's interferences with Dogtra's contractual and economic relations;

9.    That Defendants be ordered to pay Dogtra punitive damages for Defendants' willful and malicious misappropriation, breach of fiduciary duties, defamation, trade libel, and conspiratorial acts;

10.    That Defendants are jointly and severally liable as co-conspirators for the torts they conspired to commit and committed;

11.    That Defendants be ordered to pay restitution for unfair competition;

12.    That Mark So and Greg Van Curen are jointly and severally liable for the debts of C&D Micro and ECT, the individual defendants' alter egos;

13.    And that Dogtra have such other and further relief as this Court deems

2131-1002 / 543270.1

just and proper.

Respectfully submitted,

Dated:  December 31, 2016          ZUBER, LAWLER & DEL DUCA LLP

By:  */s/ Alan C. Chen*
        Alan C. Chen
        Meredith A. Smith
        Heming Xu
        Attorneys for Plaintiffs
        SOS Co., Inc. dba Dogtra and
        Dogtra Co., Ltd.

2131-1002 / 543270.1

1

## **DEMAND FOR JURY TRIAL**

2      SOS Co., Inc. and Dogtra, Co., Ltd. hereby demands trial by jury of all issues,

3   which are so triable in this action and on this complaint.

4

5   Dated:  December 31, 2016              ZUBER, LAWLER & DEL DUCA LLP

6

7                                              By:  */s/ Alan C. Chen*
                                                   Alan C. Chen
8                                                  Meredith A. Smith
                                                   Heming Xu
9                                                  Attorneys for Plaintiffs
10                                                 SOS Co., Inc. and Dogtra Co., Ltd.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2131-1002 / 543270.1